CASE NO. 16-4345

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

*New Doe Child #1, et al v. Congress of the United States, et al*

On Appeal from the United States District Court
for the Northern District of Ohio
(District Court Case #5:16-cv-00059)

APPELLANTS' OPENING BRIEF

Michael Newdow
CA Bar #220444
PO Box 248
Nice, CA  95464

(916) 273-3798
NewdowLaw@gmail.com

Thomas M. Horwitz
Ohio Bar #0062323
1991 Crocker Road, Suite 600
Westlake, OH  44145

(440) 892-3331
tmh@horwitzlpa.com

*Attorneys for Plaintiffs/Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and 28, there is no Plaintiff-Appellant corporate party that has any parent corporation or publicly held corporation that owns any of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT................................................ i

TABLE OF AUTHORITIES .......................................................... iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...............................1

JURISDICTIONAL STATEMENT................................................2

I.  District Court's Jurisdiction....................................................2

II. Court of Appeals Jurisdiction and Timeliness of the Appeal...............2

STATEMENT OF THE ISSUE PRESENTED FOR REVIEW ....................3

STATEMENT OF THE CASE.......................................................3

CONSTITUTIONAL PROVISIONS AND STATUTES ...............................4

SUMMARY OF THE ARGUMENT .............................................11

STANDARD OF REVIEW .........................................................14

**THE ARGUMENT** ...................................................................**15**

**I.  Defendants Have Violated Plaintiffs' Rights Under RFRA** ...............**15**

   **A. RFRA Provides Greater Protection for Religious Exercise than Is Available Under the First Amendment** ................................**16**

   **B. Defendants Have Substantially Burdened Plaintiffs' Free Exercise of Their Religious Beliefs**.....................................**16**

   **C. The District Court's Trivialization of the Harms to Plaintiffs Is Contrary to Fact and Law** .............................**22**

   **D. Plaintiffs' Burdens are in the Exercise of Their Religion**..............**29**

   **E. There Is No Compelling Interest for Inscribing "In G-d We Trust" on the Nation's Coins and Currency Bills** ..........................**32**

**II. Defendants Have Violated Plaintiffs' Rights Under the Free Exercise Clause** ......................................................................**34**

**III. Defendants Have Violated Plaintiffs' Rights Under the Free Speech Clause**...................................................................**38**

**IV. Defendants Have Violated Plaintiffs' Rights Under the Equal Protection Component of the Due Process Clause** ...............**42**

**CONCLUSION** .........................................................................**47**

**CERTIFICATE OF COMPLIANCE** ............................................**49**

**DESIGNATION OF LOWER COURT DOCUMENTS** ...............**50**

# TABLE OF AUTHORITIES

## CASES

*Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103 (2001) ....................................8

*Allen v. Wright*, 468 U.S. 737 (1984) ....................................29

*Am. Council of the Blind v. Paulson*, 525 F.3d 1256 (D.C. Cir. 2008) 23, 26, 33, 43

*Aronow v. United States*, 432 F.2d 242 (9th Cir. 1970) ........................................44

*Bd. of Educ. v. Grumet*, 512 U.S. 687 (1994)...........................................................29

*Bowen v. Roy*, 476 U.S. 693 (1986)............................................................... 19, 20

*Bradwell v. Illinois*, 83 U.S. 130 (1873)................................................................28

*Braunfeld v. Brown*, 366 U.S. 599 (1961) ....................................................... 19, 20

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014) ....................... passim

*Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) .. 14, 26, 35, 36

*City of Boerne v. Flores*, 521 U.S. 507 (1997) ................................................ 13, 16

*Clark v. Jeter* (1988) 486 U.S. 456.......................................................................14

*Conley v. Gibson*, 355 U.S. 41 (1957) ...................................................................14

*Employment Division v. Smith*, 494 U.S. 872 (1990) ...................................... passim

*Everson v. Board of Education*, 330 U.S. 1 (1947) ................................................11

*Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996)..................................... 33, 44

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ................................................................................................................. 13, 26

*Hernandez v. Commissioner*, 490 U.S. 680 (1989) ................................................30

*Holt v. Hobbs*, 135 S. Ct. 853 (2015) ....................................................... 15, 16, 34

*KBC Asset Mgmt. N. V. v. Omnicare, Inc.*, 769 F.3d 455 (6th Cir. 2014) ..............14

*Kidwell v. City of Union*, 462 F.3d 620 (6th Cir. 2006) ........................................42

*Korematsu v. United States*, 323 U.S. 214 (1944)......................................... 37, 38

*Legal Tender Cases*, 79 U.S. 457 (1871).............................................................22

*Ley v. Visteon Corp.*, 543 F.3d 801 (6th Cir. 2008) .............................................14

*Living Water Church of G-d v. Charter Twp. of Meridian*, 258 F. App'x 729 (6th Cir. 2007) ....................................................................................... 16, 17, 18, 19

*Lynch v. Donnelly*, 465 U.S. 668 (1984) ...............................................................45

*Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988) .. 13, 19, 20

*McCreary County v. ACLU*, 545 U.S. 844 (2005)..................................................45

*Minersville School District v. Gobitis*, 310 U.S. 586 (1940)..................................28

*Mitchell v. Helms*, 530 U.S. 793 (2000) ...............................................................31

*Murphy v. Sofamor Danek Group*, 123 F.3d 394 (6th Cir. 1997) ..........................14

*Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014)................................................45

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)..........................................................46

*Plessy v. Ferguson*, 163 U.S. 537 (1896) ...................................................... 28, 46

*Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297 (2006) .......................................................................................................42

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...................................................... passim

*Thomas v. Review. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707 (1981)... 18, 20, 31

*Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002)........................................40

*Veazie Bank v. Fenno*, 75 U.S. 533 (1869)..............................................................22

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................................30

*Wisconsin v. Yoder*, 406 U.S. 205 (1972)...................................................... passim

*Wooley v. Maynard*, 430 U.S. 705 (1977) .......................................... 27, 28, 38, 39

## STATUTES

28 U.S.C. § 1291 ......................................................................................................2

28 U.S.C. § 1331 ......................................................................................................2

29 U.S.C. § 701 et seq (Rehabilitation Act of 1973) ....................................... 23, 42

42 U.S.C. § 2000bb through § 2000bb-4 (Religious Freedom Restoration Act (RFRA)) ............................................................................................... passim

42 U.S.C. § 2000cc, *et seq.* Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) ............................................................................... 15, 16, 17

Fed. R. Civ. P. 12(b)(6)............................................................................... 2, 3, 14

## OTHER AUTHORITIES

Department of the Treasury, Agency Financial Report, Fiscal Year 2016 .............24

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ...................................................................................... passim

U.S. Const. amend. V................................................................................ 2, 3, 4, 47

U.S. Const. amend. XIV ...........................................................................................2

U.S. Const. Art. I, § 8, cl. 5.....................................................................................22

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This is a case about religious freedom, and the equal respect for all lawful religious views on the part of government that our nation's founders envisioned. Unfortunately, that is not the only thing that this case is about. It is also about the contemptible human trait that seems forever to be lurking within virtually every society: the willingness (if not outright desire) of religious majorities to trample upon the rights of religious minorities.

Were Congress to mandate that "In Protestant Christianity We Trust" be inscribed on every coin and currency bill, no court would deny that forcing Catholics, Jews, Muslims and others to personally carry and proselytize those words in order to enjoy the benefits of using the nation's money was a substantial religious burden under 42 U.S.C. § 2000bb through § 2000bb-4 (Religious Freedom Restoration Act (RFRA)). Thus, in this appeal, oral argument is essential to ensure that when the Defendants repeat their ongoing mantra that every prior court which has heard similar challenges has ruled for the government, the judges in this panel recognize that the argument is nothing but evidence of either a pro-Monotheistic bias on the part of their judicial brethren, or a cowardly decision to avoid a politically unpopular (but legally mandated) result that would protect disenfranchised minorities.

# JURISDICTIONAL STATEMENT

## I. District Court's Jurisdiction

This is a civil action claiming violations of the First and Fifth Amendments to the Constitution of the United States of America. Thus, the District Court had subject matter jurisdiction under 28 U.S.C. § 1331. This action also involves a RFRA claim. Under RFRA, a District Court has subject matter jurisdiction pursuant to 42 U.S.C. § 2000bb-1(c).

## II. Court of Appeals Jurisdiction and Timeliness of the Appeal

This appeal stems from a final order that disposed of all parties' claims, rendered by the District Court for the Northern District of Ohio. Specifically, on November 30, 2016, the District Court entered an Order (RE 39) and a Judgment (RE 40) granting the defendants' Motion to Dismiss under Fed. R. Civ. P. 12(b)(6). This Court of Appeals has jurisdiction under 28 U.S.C. § 1291. A timely Notice of Appeal was filed by Plaintiffs on November 30, 2016 (RE 41).

## STATEMENT OF THE ISSUE PRESENTED FOR REVIEW

Whether the District Court erred in granting Defendants' Motion to Dismiss.

## STATEMENT OF THE CASE

This case involves constitutional (Free Exercise, Free Speech, and Equal Protection) and statutory (Religious Freedom Restoration Act) challenges to the federal statutes that mandate the inscription of "In G-d[1] We Trust" on the nation's coins[2] and currency bills.[3] On February 29, 2016, Plaintiffs filed an extensive complaint which included details regarding the history of those statutes. RE 8. Defendants filed a Fed. R. Civ. P. 12(b)(6) Motion to Dismiss on May 10, 2016. RE 9.

On November 30, 2016, Hon. Benita Y. Pearson, District Judge (NDOH), filed a Memorandum of Opinion & Order granting Defendants' Rule 12(b)(6) Motion to Dismiss. RE 39. The Court's Judgment Entry was filed the same day. RE 40.

---

[1] Out of respect for Plaintiff Clayman, "G-d" is used throughout Plaintiffs' filings. *See* RE 8, Page ID #251-52.
[2] 31 U.S.C. § 5112(d)(1) ("United States coins shall have the inscription 'In G-d We Trust'.").
[3] 31 U.S.C. § 5114(b) ("United States currency has the inscription 'In G-d We Trust' in a place the Secretary decides is appropriate.").

**CONSTITUTIONAL PROVISIONS AND STATUTES**

Free Exercise Clause:[4]  "Congress shall make no law ... prohibiting the free exercise [of religion]."

Free Speech Clause:[5]  "Congress shall make no law ... abridging the freedom of speech."

Due Process Clause:[6]  "No person ... shall ... be deprived of life, liberty, or property, without due process of law."

31 U.S.C. § 5112(d)(1):  "United States coins shall have the inscription 'In G-d We Trust'."

31 U.S.C. § 5114(b):  "United States currency has the inscription 'In G-d We Trust' in a place the Secretary decides is appropriate."

---

[4] U.S. Const. amend I.
[5] *Id.*
[6] U.S. Const. amend V.

# Religious Freedom Restoration Act (RFRA)

42 U.S. Code § 2000bb-1:     Free exercise of religion protected

(a) In general
Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception
Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—
(1) is in furtherance of a compelling governmental interest; and
(2) is the least restrictive means of furthering that compelling governmental interest.

(c) Judicial relief
A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government. Standing to assert a claim or defense under this section shall be governed by the general rules of standing under article III of the Constitution.


42 U.S. Code § 2000bb-2     Definitions

As used in this chapter—
(1) the term "government" includes a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, or of a covered entity;
(2) the term "covered entity" means the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States;
(3) the term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion; and
(4) the term "exercise of religion" means religious exercise, as defined in section 2000cc–5 of this title.[7]

---

[7] 42 U.S. Code § 2000cc-5 is shaded in gray on the next page and a half.

42 U.S. Code § 2000cc-5        Definitions

In this chapter—

(1) Claimant

The term "claimant" means a person raising a claim or defense under this chapter.

(2) Demonstrates

The term "demonstrates" means meets the burdens of going forward with the evidence and of persuasion.

(3) Free Exercise Clause

The term "Free Exercise Clause" means that portion of the first amendment to the Constitution that proscribes laws prohibiting the free exercise of religion.

(4) Government

The term "government"—

(A) means—

(i) a State, county, municipality, or other governmental entity created under the authority of a State;

(ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (i); and

(iii) any other person acting under color of State law; and

(B) for the purposes of sections 2000cc–2(b) and 2000cc–3 of this title, includes the United States, a branch, department, agency, instrumentality, or official of the United States, and any other person acting under color of Federal law.

(5) Land use regulation

The term "land use regulation" means a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

(6) Program or activity

The term "program or activity" means all of the operations of any entity as described in paragraph (1) or (2) of section 2000d–4a of this title.

(7) Religious exercise

(A) In general

The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

(B) Rule

The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

## 42 U.S. Code § 2000bb-3    Applicability

(a) In general

This chapter applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993.

(b) Rule of construction

Federal statutory law adopted after November 16, 1993, is subject to this chapter unless such law explicitly excludes such application by reference to this chapter.

(c) Religious belief unaffected

Nothing in this chapter shall be construed to authorize any government to burden any religious belief.

## 42 U.S. Code § 2000bb-4    Establishment clause unaffected

Nothing in this chapter shall be construed to affect, interpret, or in any way address that portion of the First Amendment prohibiting laws respecting the establishment of religion (referred to in this section as the "Establishment Clause"). Granting government funding, benefits, or exemptions, to the extent permissible under the Establishment Clause, shall not constitute a violation of this chapter. As used in this section, the term "granting", used with respect to government funding, benefits, or exemptions, does not include the denial of government funding, benefits, or exemptions.

## STATEMENT OF THE FACTS

The United States Constitution contains a guarantee of equal protection within the "due process" provision of the Fifth Amendment. *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 105 (2001). This guarantee is specifically applied to religion in the First Amendment, which states that "Congress shall make no law ... prohibiting the free exercise [of religion]." U.S. Const. amend. I. By statute, Congress has expanded this free exercise protection above and beyond the limits deemed adequate by the Supreme Court. Thus, since 1993, "[the federal g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person … is in furtherance of a compelling governmental interest; and … is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(1) and (b)(2).

For the first seven decades of the nation's existence, the coins produced by the Department of the Treasury were free of any religious verbiage. First Amended Complaint ("FAC"), RE 8, Page ID #263-68 (¶¶ 110-141). In 1864, however, due to "increased religious sentiment," *id*., Page ID #264 (¶ 117), "In G-d We Trust" was inscribed on a two-cent piece, *id*., Page ID #268 (¶ 137). According to the Director of the Mint at the time:

> We claim to be a Christian nation. Why should we not
> vindicate our character by honoring the G-d of Nations, in
> the exercise of our political Sovereignty as a Nation? Our
> national coinage should do this. Its legends and devices
> should declare our trust in G-d; in Him who is the "King of
> kings and Lord of lords." … Let us reverently acknowledge
> his sovereignty, and let our coinage declare our trust in G-d.

*Id.*, Page ID #265 (¶ 127). Thus, it can readily be seen that the "In G-d We Trust"

inscription on the money was specifically intended to have the following two

purposes: (i) to "reverently acknowledge" the sovereignty of G-d," and (ii) to

"declare our trust in G-d." Moreover, the "G-d" being referenced was Jesus Christ

(i.e., "King of kings and Lord of lords"), with these purposes to be achieved as "a

Christian nation."

In addition to supporting a particular religious view, the challenged

inscription was meant to spread that particular religious view "to all the nations of

the world." *Id.*, Page ID #272 (¶ 160). As one congressman declared, each coin

bearing the motto helps "preach the religions of Jesus Christ" as it "goes across the

ocean and is held in the hands of those who do not know of the existence of the

Saviour of the world." *Id.*, Page ID #273 (¶ 168). Another congressman similarly

proclaimed that the inscriptions of "In G-d We Trust" on the coins "is a declaration

not only to our people at home, but to all peoples, and to all nations, all over the

world, that ours is a nation with a firm and steadfast faith in G-d." *Id.*, Page ID

#275 (¶ 177).

The U.S. Mint itself has noted that "[w]herever United States coins travel, they serve as reminders of the values that all Americans share" and has listed "In G-d We Trust" as "words ... that define us as Americans." *Id*., Page ID #312 (¶ 412). Those words also are among the "American values and ideals" that the Mint specifically seeks to proselytize. *Id*., Page ID #312-13 (¶¶ 412-13).

Since 1938, all coins have carried the "In G-d We Trust" message.[8] However, when its absence on the currency was noticed in 1953, RE 8, Page ID #277 (¶ 192), Congress "remedied" the situation and acted to impose its religious penchant for "trust in G-d" beyond our borders, noting that "the American dollar travels all over the world, into every country of the world, and frequently gets behind the Iron Curtain, ... . [That] it carries ['In G-d We Trust'] ... is one of the most compelling reasons why we should put it on our currency." *Id*., Page ID #312 (¶ 408).

Plaintiffs are (a) individuals and groups who definitely do not trust in G-d, along with (b) a devout Jewish individual who believes that participating in any activity that ultimately results in the obliteration of G-d's name is an absolute sin. Thus, all Plaintiffs are placed in the position where – if they choose to avail themselves of the important benefits that attach to using the nation's legal tender – they will have to violate their own religious beliefs.

## SUMMARY OF THE ARGUMENT

In *Sherbert v. Verner*, 374 U.S. 398 (1963), the Supreme Court stated that "[g]overnment may [not] compel affirmation of a repugnant belief," *id*., at 402, nor force an individual "to choose between following the precepts of her religion and forfeiting benefits," *id*., at 404. The ability to use the nation's sole legal tender in everyday commerce is clearly a benefit, and the high court "emphasized that conditions upon public benefits cannot be sustained if they so operate, whatever their purpose, to inhibit or deter the exercise of First Amendment freedoms." *Id*., at 405. In other words, "to condition the availability of benefits upon [an] appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties." *Id*., at 406. Of particular note is that the Court concluded its analysis by writing that government may not "'exclude individual ... Jews [or] Non-believers ... because of their faith, or lack of it, from receiving the benefits of public welfare legislation.'" *Id*., at 410 (citing *Everson v. Board of Education*, 330 U.S. 1, 16 (1947).

Nine years later, in *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the Court actually strengthened the holding in *Sherbert*, since (unlike in *Sherbert)* that later case involved a compelling state interest: public education of the nation's youth. *Yoder*, 406 U.S., at 213 ("Providing public schools ranks at the very apex of the

---

[8] https://www.treasury.gov/about/education/Pages/in-g-d-we-trust.aspx.

function of a State"). Yet, even though "those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion," *id*., at 215, the Court held that the free exercise rights of Amish parents may not be abridged by neutral statutes requiring education of their children beyond eighth grade. Government, wrote the Court, may not compel individuals "to perform acts undeniably at odds with fundamental tenets of their religious beliefs." *Id*., at 218.

When the Supreme Court, in *Employment Division v. Smith*, 494 U.S. 872 (1990), held "that generally applicable, religion-neutral laws that have the effect of burdening a particular religious practice need not be justified by a compelling governmental interest," *id*., at 886 n.3, Congress acted to counter this judicial reversal of *Sherbert* and *Yoder*. It did so by passing RFRA, specifically disapproving of the fact that "in *Employment Division v. Smith*, 494 U.S. 872 (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." 42 U.S. Code § 2000bb(a)(4). With RFRA, therefore, Congress acted "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S. Code § 2000bb(b)(1).

Although RFRA was invalidated as applied to the states in *City of Boerne v. Flores*, 521 U.S. 507 (1997), it was subsequently upheld as applied to the federal government. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006). Inasmuch as the statute specifically serves "to provide a claim or defense to persons whose religious exercise is substantially burdened by government," 42 U.S. Code § 2000bb(b), the court below clearly erred in ruling that Plaintiffs here – comprised of (a) Atheists who are forced to bear and proselytize a religious claim that is the complete opposite of the central tenet of their religious belief system, and (b) a Jewish individual who is forced to sin – have failed to state a claim.[9]

---

[9] Assuming that the panel here will heed the Supreme Court's caution that "[a] fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them," *Lyng v. N.W. Indian Cemetery Prot. Assoc.*, 485 U.S. 439, 445 (1988), Plaintiffs are not including their Free Exercise, Free Speech or Equal Protection claims in this Summary of the Argument. Those claims will be included below, however, on the off-chance that the lower court's decision on the RFRA claim is mistakenly affirmed.

## STANDARD OF REVIEW

"We review de novo a district court's dismissal of a complaint for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6)." *Ley v. Visteon Corp.*, 543 F.3d 801, 805 (6th Cir. 2008). "The reviewing court accepts the plaintiff's allegations as true and construes the complaint in its favor." *KBC Asset Mgmt. N. V. v. Omnicare, Inc.*, 769 F.3d 455, 460 (6th Cir. 2014). Of particular note here, "[t]he district court may not grant a Rule 12(b)(6) motion based on disbelief of factual allegations in the complaint." *Murphy v. Sofamor Danek Group*, 123 F.3d 394, 400 (6th Cir. 1997). "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Additionally, strict scrutiny is the proper standard where fundamental rights are infringed. *Clark v. Jeter* 486 U.S. 456 (1988). This has been specifically noted for claims involving the Free Exercise Clause. *See, e.g., Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993) ("A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases."). Strict scrutiny is also applied for RFRA violations. 42 U.S.C. § 2000bb(a)(3), §§ 2000bb(b)(1) and (b)(2), and §§ 2000bb-1(b)(1) and (b)(2).

# THE ARGUMENT

## I. Defendants Have Violated Plaintiffs' Rights Under RFRA

"Congress enacted RFRA in order to provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015). In fact, RFRA has "expansive protection for religious liberty," *id.*, at 860, as revealed by the facts that:

(1) "Congress defined 'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,'" *id.*;

(2) "Congress mandated that this concept 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution,'" *id.*; and

(3) "Congress stated that [RFRA] 'may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise,'" *id.*[10]

With this framework in mind, it is incontrovertible that Defendants have substantially burdened Plaintiffs in their religious exercises, and that the District Court erred in reaching its contrary conclusion.

---

[10] Statutory citations are omitted from each of these three quotations. *Holt* involved a challenge under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 114 Stat. 803, 42 U.S.C. § 2000cc, *et seq.* However, as *Holt* made clear, RFRA is a "sister statute" of RLUIPA, *id.*, at 859, and the intention with respect to the expansiveness of the two statutes is identical.

## A. RFRA Provides Greater Protection for Religious Exercise than Is Available Under the First Amendment

The District Court wrote that "[t]he Religious Freedom Restoration Act does not provide additional rights beyond the First Amendment." RE 39, Page ID #707. This is questionable at best, given the clear statement in *Holt* just provided on the preceding page. *See also City of Boerne*, 521 U.S., at 533-34 ("The stringent test RFRA demands ... far exceed[s] any pattern or practice of unconstitutional conduct under the Free Exercise Clause as interpreted in *Smith*."). Either way, as in *Holt*, "[t]he District Court ... misunderstood the analysis that [RFRA] demands." 135 S. Ct., at 857.

## B. Defendants Have Substantially Burdened Plaintiffs' Free Exercise of Their Religious Beliefs

In denying that Defendants have substantially burdened Plaintiffs in the free exercise of their religious beliefs, the District Court began by claiming, "[t]he Supreme Court has made clear that meeting the 'substantial burden' test is a high bar," alluding to *Living Water Church of G-d v. Charter Twp. of Meridian*, 258 F. App'x 729 (6th Cir. 2007). Yet the major premises of *Living Water* were (i) that "[t]he U.S. Supreme Court has not yet defined 'substantial burden' as it applies to RLUIPA," *id.*, at 733, and (ii) "that the 'term "substantial burden" as used in this Act is not intended to be given any broader interpretation than the Supreme Court's articulation of the

concept of substantial burden or religious exercise,'" *id*. Again, as was just shown by examining *Holt*, those premises are no longer valid.[11]

Even if the *Living Water* approach has not been eviscerated by subsequent Supreme Court holdings, Plaintiffs here should still prevail. Under *Living Water*, the issue can be distilled down to "the following consideration[:] ... does the government action place substantial pressure on a religious institution to violate its religious beliefs ...?" 258 Fed. Appx., at 737. Here, where (i) Defendants have mandated that a disputed religious claim be inscribed on every coin and currency bill manufactured by the Treasury (knowing and intending for those coins and currency bills to be a key medium of exchange in everyday commerce), and where (ii) bearing (and proselytizing) that claim is absolutely and directly prohibited under Plaintiffs' religious belief systems, government has irrefutably placed substantial pressure on Plaintiffs to violate their religious beliefs.

---

[11] It is questionable if those premises were valid in 2007. As the Supreme Court recently stated:

> Before RLUIPA, RFRA's definition made reference to the First Amendment. *See* §2000bb-2(4) (1994 ed.) (defining "exercise of religion" as "the exercise of religion under the First Amendment"). In RLUIPA, in an obvious effort to effect a complete separation from First Amendment case law, Congress deleted the reference to the First Amendment and defined the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." §2000cc-5(7)(A). And Congress mandated that this concept "be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." §2000cc-3(g).

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2761-62 (2014).

Because this *Living Water* distillation derives from the Supreme Court's pre-*Smith Sherbert* and *Yoder* decisions (which are the decisions upon which RFRA is based) it is worthwhile to inspect those original source materials. Doing so reveals that the District Court's analysis ran completely contrary to what the high court wrote. Thus, in *Sherbert* (where a substantial burden on the exercise of religion was found), it was stated that "not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable." 374 U.S., at 404. In the instant case, the "benefits" are those that stem from the ability to use the nation's sole legal tender in everyday commerce. With Plaintiffs' "declared ineligibility" derived (as was the case in *Sherbert*) solely from their religious practices, the pressure upon them to forgo those practices is just as "unmistakable."

In *Thomas v. Review. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707 (1981), this notion from *Sherbert* was reiterated:

> Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists.

*Id.*, at 717-18. It is the idea within this prose that the *Living Water* distillation most aptly reflects.

Interestingly, the District Court here cited to that very passage. RE 39, Page ID #708. However, it then referenced *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), *Braunfeld v. Brown*, 366 U.S. 599, 605-06 (1961), and *Bowen v. Roy*, 476 U.S. 693, 703 (1986), to conclude that Plaintiffs have suffered no substantial burden. But the whole point of RFRA was "to restore the compelling interest test as set forth in [*Sherbert*] and [*Yoder*]," 42 U.S.C. § 2000bb(b)(1), and to cast aside the approach taken by the Supreme Court "in *Employment Division v. Smith*, 494 U.S. 872 (1990) [where] the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion," 42 U.S.C. § 2000bb(a)(4). Thus, to analyze a RFRA claim by citing to cases relied upon in *Smith* (such as *Lyng*, *Braunfeld*, and *Bowen,* where the Court specifically noted that "we declined to apply Sherbert analysis," *Smith*, 494 U.S., at 883) and completely ignore the commands of *Sherbert* and *Yoder*, is to offend the very notions upon which RFRA is based.

*Thomas*, unlike *Lyng*, *Braunfeld*, and *Bowen*, was decided along the lines of *Sherbert* and *Yoder* and is, therefore, consistent with RFRA. In *Thomas*, the Supreme Court importantly noted that the infringement upon free exercise can be "substantial" even with "indirect" compulsion. *Thomas*, 450 U.S., at 718. Thus, in *Burwell* – despite the argument "that the connection between what the objecting parties must do (provide health-insurance coverage for four methods of contraception that may operate after the fertilization of an egg) and the end that they find to be morally wrong (destruction of an embryo) is simply too attenuated," *id*., 134 S. Ct., at 2777 – the majority held that the plaintiff's rights to the free exercise of religion under RFRA was violated. If that was true for the remarkably indirect imposition seen in *Burwell*, then the violation in the instant case cannot be denied. In other words, if there is a RFRA violation when the government forces a company a plaintiff owns (but not the plaintiff himself) to provide general medical insurance that includes a single provision that will cover the use of a medication that may be chosen by some anonymous employee (or her covered relative), who may (totally unbeknownst to the plaintiff) someday have sexual intercourse that results in a fertilized egg, that may (in a manner for which there is no expert consensus) cause a miscarriage (which is an outcome that commonly arises in women whether they take such

medications or not), then there most assuredly is a RFRA violation in the instant case. After all, while seeking relief for this exceedingly indirect and attenuated injury, the *Burwell* plaintiff was simultaneously disbursing wages that had an infinitely greater probability of being used to purposefully pay for a surgical abortion of a much later-stage fetus. Moreover, nothing in the record suggested that avoiding abortion – especially a mere potential abortion involving some unknown third party – is or was **the** central tenet of the *Burwell* plaintiff's religious ideology.[12]

In the case at bar, it is Plaintiffs themselves who are forced against their will to do the religiously-offensive act, not some distant and unknown third party acting voluntarily. The act is real and takes place daily, not potential and occurring rarely (if ever). Moreover, the inscriptions of "In G-d We Trust" are not a minuscule part of a worthy program like health insurance, but the entirety of statutes designed to favor a controversial religious view. Finally (although, admittedly, RFRA's capacious breadth blurs the distinction), the act is not an ancillary one in terms of religious belief, but strikes at the essence and core of Plaintiffs' religious ideology.

---

[12] To be sure, under RFRA, "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *See* 42 U.S.C. § 2000bb-2(4) (referencing U.S.C. § 2000cc-5(7)(A)). But the fact that RFRA extends its reach to non-central exercises does not mean that reaching a central exercise is not a more egregious violation.

## C. The District Court's Trivialization of the Harms to Plaintiffs Is Contrary to Fact and Law

In *Burwell*, the Supreme Court provided a dictum that is perfectly on point with the chief issue in the instant case: "[Defendants] would effectively exclude [Plaintiffs] from full participation in the economic life of the Nation. RFRA was enacted to prevent such an outcome." *Burwell*, 134 S. Ct., at 2783. Yet, to the District Court, "full participation in the economic life of the Nation" is apparently of little concern, as evidenced not only by the trivialization of Plaintiffs' inability to use the nation's coins and currency bills, but by the fact that this important issue was dispensed with in one short paragraph comprised of three rather fatuous arguments. *See* RE 39, Page ID #708-09.

Before examining those arguments, it should be noted that the power to coin money is specifically set forth in the Constitution. U.S. Const. Art. I, § 8, cl. 5. That document's framers surely did not enumerate powers that they did not believe were of significant benefit to "We the People." On the contrary, they created the document so that Congress could act "in the manner most beneficial to the people." *Legal Tender Cases*, 79 U.S. 457, 539 (1871). Thus, Congress has "undisputed constitutional powers ... to provide a currency for the whole country, ... [and to] secure the benefit of it to the people." *Veazie Bank v. Fenno*, 75 U.S. 533, 549 (1869).

In *Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1262 (D.C. Cir. 2008), blind individuals sued under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*, alleging that the Treasury Department violated Congress's command that:

> No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied **the benefits of**, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency ... .

29 U.S.C. § 794 (emphasis added), when it produced currency bills that did not allow those with inadequate visual capabilities to distinguish between the various denominations. In its opinion, the D.C. Circuit cited a report written by the National Research Council of the National Academy of Sciences, wherein it was stated that "'[a]n important aspect of a person's full participation in today's society is being able to conveniently and confidentially exchange currency in everyday transactions, as when using public transportation or making purchases.'" *Paulson*, 525 F.3d, at 1262 (citation omitted). Additionally, "the benefits of currency" were repeatedly noted. *See, e.g., id.*, at 1268, 1269, 1270, 1273.

Among the "strategic objectives" of Defendant Lew's Treasury Department is "[f]acilitat[ing] commerce by providing trusted and secure

U.S. currency, products, and services for use by the public."[13] Two large Treasury Department bureaucracies exist, dedicated to producing currency bills (Bureau of Engraving and Printing) and coins (U.S. Mint) for use in commerce. Together, they have a budget of more than four billion dollars.[14] The Mint, which declares that "manufacturing and distributing circulating ... coins" is a key part of its "primary mission,"[15] boasts that "people cherish our products."[16] Additionally, the number of items of legal tender produced by these two institutions is enormous. BEP, for instance, produced over seven billion currency notes in 2015,[17] with the number set each year "to meet public demand."[18] With a demand that great, there surely must be quite a substantial benefit to those behind that "demand."

The Mint more than doubled the BEP production, having "produced 16.2 billion circulating coins."[19] These figures, of course, do not count the far greater number of currency notes and coins already in circulation. Of

---

[13] Department of the Treasury, Agency Financial Report, Fiscal Year 2016, available at https://www.treasury.gov/about/budget-performance/annual-performance-plan/Documents/FY16%20AFR%20(508)_FINAL.pdf, at 15.

[14] BEP's current budget is over $850 million. https://www.treasury.gov/about/budget-performance/CJ17/25.%20BEP%20FY%202017%20CJ.PDF at 7. Total Budgetary Resources for the Mint (in 2015) was more than $3.5 billion.https://www.usmint.gov/downloads/about/annual_report/2015AnnualReport.pdf at 35.

[15] https://www.usmint.gov/about_the_mint/?action=coin_production.

[16] *Id.*

[17] https://www.moneyfactory.gov/resources/productionannual.html.

[18] https://uscurrency.gov/about-us.

[19] https://www.usmint.gov/downloads/about/annual_report/2015AnnualReport.pdf at 1.

special note (as regards the Mint) is that – for ten years in a row – the cost of producing both pennies and nickels has been greater than the face value of the coins.[20] Why would the government produce coins, knowing it will lose money by doing so, if having these items did not provide an important benefit? The answer is they do provide an important benefit: They serve "the ... needs of retailers and the public."[21] That benefit, under RFRA, should accrue for Plaintiffs here as it does for everyone else.

With the preceding in mind, the District Court's arguments are bizarre, to say the least. The first (i.e., that there is no substantial burden because "[c]redit cards and checks allow Plaintiffs to conduct the bulk of their purchases with currency not inscribed with the motto," RE 39, Page ID #708-09), makes a mockery of the concept of free exercise. To begin with, that Plaintiffs can conduct "the bulk of their purchases" without using the nation's money does nothing to help them with the many purchases where credit cards and checks are not viable options. Second, the Supreme Court has never suggested that because some judge can think of an alternative way to accomplish a goal, the burden on one's free exercise of religion disappears. The fact that we have a Mint and BEP producing so many coins and currency bills shows that a huge number of people find that it is

---

[20] https://www.usmint.gov/downloads/about/annual_report/2015AnnualReport.pdf at 8.

preferable to use those items rather than credit cards and checks. Under RFRA, Plaintiffs cannot be deprived of that choice because the legislature wishes to espouse a religious ideology (or for any other reason lacking a compelling interest).[22]

The Supreme Court never for an instant suggested that the state should prevail in *Yoder* because the Amish could have arranged to find (or to create) an accredited school that would not have "expos[ed] their children to a 'worldly' influence in conflict with their beliefs." *Yoder*, 406 U.S., at 211. Similarly, although the Santerians in *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520 (1993) could have performed their animal sacrifice rituals elsewhere, the high court did not use that fact to rule in Hialeah's favor. Among various churches, millions (if not billions) of members receive communion without drinking hoasca. Yet not once did the unanimous Supreme Court contend that such a reality had the slightest relevance to the church's RFRA claim in *O Centro*.

---

[21] https://www.usmint.gov/downloads/about/annual_report/2015AnnualReport.pdf at 8.

[22] In *Paulson*, *supra*, the existence of credit cards and other modalities that allowed for the blind plaintiffs to engage in everyday commerce was also used as a justification for not requiring the Treasury to alter its currency. ("The Secretary contends that various coping mechanisms that enable the visually impaired to use U.S. currency, as well as the availability of portable currency readers to identify denominations and credit cards as an alternative to cash, demonstrate that there is no denial of meaningful access to currency." 525 F.3d, at 1259.) The D.C. Circuit soundly rejected that argument.

Finally, even if there were an iota of jurisprudential validity to any of these District Court arguments, many of the Plaintiffs are children. As such, "[c]redit cards and checks" are not available options, leaving them with no alternative to using the money inscribed with the "In G-d We Trust" message, even when those options might be available to adults.[23]

The District Court's second argument involved the interplay between then-Justice Rehnquist (in dissent) and Chief Justice Burger (who wrote the majority opinion) in *Wooley v. Maynard*, 430 U.S. 705 (1977). What should be recognized as the important part of that interplay is that Justice Rehnquist immediately recognized how, under the majority's analysis for the "Live Free or Die" message on George Maynard's license plate, the "In G-d We Trust" message on money should also be impermissible for Atheists. Chief Justice Burger never actually addressed Justice Rehnquist's challenge, and he specifically noted that the issue of the constitutionality of "In G-d We Trust" on the money "is not before us today," *id.*, at 717 n.15. All the Chief Justice did was deflect the concern, writing "that currency, which is passed from hand to hand, differs in significant respects from an automobile, which is readily associated with its operator." *Id.*

---

[23] Of course, those other options are generally unavailable to adults as well when the item desired is, for example, a popsicle from the neighborhood ice cream truck, a wash and dry at a coin laundromat, a ride on a bus, or a play on a videogame.

The Chief Justice's statement was certainly correct. So, too, would be statements that women differ in significant respects from men, blacks differ in significant respects from whites, Jehovah's Witnesses differ in significant respects from those attached to other religions, and so on. But unless the District Court believes those just-given differences are relevant in regard to the constitutional questions in *Bradwell v. Illinois*, 83 U.S. 130 (1873), *Plessy v. Ferguson*, 163 U.S. 537 (1896), and *Minersville School District v. Gobitis*, 310 U.S. 586 (1940), its conclusion (that the "In G-d We Trust" inscriptions in this case have been validated by *Wooley's* mention of a difference between currency and automobiles) is totally unwarranted.

Government doesn't shed its obligations under the First Amendment and RFRA because a plaintiff does not "publicly advertise" a religious claim, *Wooley*, 430 U.S., at 717 n.15, or because there is a difference between the given act and an automobile. Reading the Bible in one's home, wearing crosses or stars of David under one's clothing, engaging in silent prayer, and myriad other religious activities all meet those two criteria. As grossly offensive as it would be to permit interference with these activities for those two reasons, it is no less offensive to permit interference here.[24]

---

[24] Incidentally, the "publically advertise" issue was raised by Chief Justice Burger only because Mr. Maynard wrote: "'I refuse to be coerced by the State into advertising a slogan which I find morally, ethically, religiously and politically abhorrent.'" *Wooley*, 430 at 713.

The single sentence comprising the District Court's third argument is, perhaps, the most offensive: "Plaintiffs' other concerns, that they may be subject to peer pressure or ridicule, or that their children may question their beliefs, are unlike the choice between a 'basic benefit and a core belief' described in the Supreme Court's case law." RE 39, Page ID #709 (citation omitted). Being able to use the nation's legal tender without those severe social consequences is certainly a "benefit." *Cf. Allen v. Wright*, 468 U.S. 737, 755 (1984) ("There can be no doubt that [stigmatizing injury] is one of the most serious consequences of discriminatory government action."). *See also Bd. of Educ. v. Grumet*, 512 U.S. 687, 728 (1994) (Kennedy, J., concurring) ("The danger of stigma and stirred animosities is no less acute for religious line-drawing than for racial."). That Plaintiffs are forced to endure those evils solely because Defendants have chosen to inscribe an exclusionary religious claim on the nation's coins and currency bills is, possibly, the most severe of the RFRA harms in this case.

### D. Plaintiffs' Burdens are in the Exercise of Their Religion

It is difficult to determine whether the District Court claimed (in addition to there being no significant burden) that whatever burden there is does not pertain to the free exercise of religion. If that was one of the Court's determinations, it goes

directly against the notion that "[o]fficial compulsion to affirm what is contrary to one's religious beliefs is the antithesis of freedom of worship." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 646 (1943) (Murphy, J., concurring). Moreover, "the 'exercise of religion' involves 'not only belief and profession but the ... abstention from ... physical acts' that are 'engaged in for religious reasons.'" *Burwell*, 134 S. Ct., at 2770.

Should the panel here have any doubt in this regard, Plaintiffs suggest that some perfectly analogous monetary verbiage be considered. For instance, had Congress decided to mandate inscriptions of "G-d is a Fiction" on all legal tender, it is doubtful that any tribunal would deny the claim of a devout Christian, seeking relief under RFRA because she, in good conscience, cannot bear and proselytize those offensive (to her) words. A challenge by Catholics, Jews, and others to "In Protestant Christianity We Trust" would surely be upheld as well. Of course neither "G-d is a Fiction" nor "In Protestant Christianity We Trust" would ever make its way onto our coins and currency because (unlike Atheists) Monotheists, Catholics, Jews, and others are not severely disenfranchised religious minorities in this nation.

"It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989). *See also*,

*Mitchell v. Helms*, 530 U.S. 793, 828 (2000) ("It is well established ... that courts should refrain from trolling through a person's or institution's religious beliefs."); *Smith*, 494 U.S., at 887 ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."). That the District Court would ignore these repeated Supreme Court warnings and be so bold (or is it cowardly?) as to sweep aside what are the sincere religious beliefs of Plaintiffs is outlandish.

Whatever mental gymnastics the District Court was engaged in when it wrote, "Plaintiffs cannot meet the threshold showing that their exercise of religion is substantially burdened," RE 39, Page ID #709, it surely was not pondering the Supreme Court's admonition that "[t]he narrow function of a reviewing court in this context is to determine whether there was ... an honest conviction that such [act] was forbidden by his religion." *Thomas*, 450 U.S., at 716. Thus, it does not even matter if the offense is understood by those hearing such cases, for "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Id*.

That said, it is extraordinary that any court is unable to comprehend why Plaintiffs hold their "honest conviction[s]" that bearing and proselytizing "In G-d We Trust" is prohibited under their religious systems. After all (according to the Director of the Mint serving when "In G-d We Trust" was first placed on a United

States coin, RE 8, Page ID #265 (¶ 127)), those words "declare our trust in G-d; in him who is the 'King of kings and Lord of lords.'" Nearly a century later, when those words were deemed mandatory for all coins and currency bills, Congress indicated that the inscriptions still "witness our faith in Divine Providence." *Id.*, Page ID #287 (¶ 261). "As Rep. Emanuel Cleaver of Missouri stated, 'no respectable atheist would walk around with something in his pocket that said "In G-d We Trust."'" RE 8, Page ID #311 (¶ 401). That is because bearing and proselytizing that message is completely contrary to (and forbidden by) the Atheist plaintiffs' religious beliefs. For Plaintiff Clayman, religious beliefs (gleaned by his reading of the Torah) forbid carrying that message as well. Thus, the "narrow function" for this panel is to acknowledge these honest convictions, which should lead to a rapid reversal of the District Court's decision.

### E. There Is No Compelling Interest for Inscribing "In G-d We Trust" on the Nation's Coins and Currency Bills

With it established that Defendants have substantially burdened Plaintiff's religious exercise, it must be shown that the "In G-d We Trust" inscriptions are "in furtherance of a compelling governmental interest," 42 U.S. Code § 2000bb-1(b)(1), and are "the least restrictive means of furthering that compelling governmental interest," *id.*, § 2000bb-1(b)(2), for this panel to affirm the lower court's opinion. That is an impossible task.

That there is no compelling interest is readily appreciated by recalling that the nation managed its affairs perfectly well for 75 years without "In G-d We Trust" on its coinage. RE 8, Page ID #268 (¶ 137) (noting the first inscription of that phrase on a two-cent piece in 1864). Similarly, for more than another century, monetary instruments without those words functioned in a manner indistinguishable (except for their religious effects) from those that carried the challenged motto.[25] Furthermore, myriad other countries manage their coins and currency without religious dogma inscribed. *Cf. Am. Council of the Blind v. Paulson*, 525 F.3d, at 1263, 1265 and 1267 (revealing that the ability of other countries to act in the desired non-discriminatory manner was an important factor in the D.C. Circuit's analysis).

An argument made by the Tenth Circuit is that the inscription "symbolizes the historical role of religion in our society, formalizes our medium of exchange, fosters patriotism, and expresses confidence in the future." *Gaylor v. United States*, 74 F.3d 214, 216 (10th Cir. 1996). Plaintiffs submit that those claims are valid only in the eyes of Monotheists. For Plaintiffs, none is true. But even assuming, *arguendo*, the validity of these claims (and assuming further, the more absurd

---

[25] https://www.treasury.gov/about/education/Pages/in-g-d-we-trust.aspx (indicating that the $50 and $100 Federal Reserve notes did not have the "In G-d We Trust" inscriptions until 1966). Obviously, coins and currency bills without the inscription persisted in general circulation for many subsequent years as well.

notion that these claims serve interests that are "compelling"), they are certainly not the least restrictive means of serving those interests. As just two examples (using the same format, no less), "In Religious Freedom We Trust" or "In Religious Equality We Trust" serves those interests, too (in a manner that – unlike the current verbiage – unquestionably comports with the Bill of Rights).

## II. Defendants Have Violated Plaintiffs' Rights Under the Free Exercise Clause

In *Smith*, the Supreme Court withdrew from its prior position of requiring government to meet strict scrutiny demands when any of its actions infringed upon an individual's free exercise rights. Otherwise, wrote the Court, we would have "a system in which each conscience is a law unto itself." *Smith*, 494 U.S., at 890. Because RFRA was enacted "in order to provide greater protection for religious exercise than is available under the [Free Exercise Clause]," *Holt*, 135 S. Ct. 859-60, an attempt by Plaintiffs here to argue that their Free Exercise rights are violated may seem superfluous. However, that argument will hopefully emphasize that only "neutral" laws fall under *Smith*'s ambit, as was referenced repeatedly throughout the opinion. *See, e.g., Smith*, 494 U.S., at 879 (referencing "a 'valid and neutral law of general applicability'") (citation omitted); *id*., at 880 (referencing "a neutral, generally applicable regulatory law"); *id*., at 881 (referencing "a neutral, generally applicable law"). Because the statutes to which Plaintiffs object – i.e., 31 U.S.C. §

5112(d)(1) ("United States coins shall have the inscription 'In G-d We Trust'.") and 31 U.S.C. § 5114(b) ("United States currency has the inscription 'In G-d We Trust' in a place the Secretary decides is appropriate.") – are in no sense "neutral," *Smith*'s Free Exercise jurisprudence is not applicable in this case.

Rather, *Church of Lukumi Babalu Aye v. City of Hialeah* (where a city passed a law designed to interfere with a particular church's rituals) is the appropriate guide. In that case, the Supreme Court (citing to *Smith*) noted:

> In addressing the constitutional protection for free exercise of religion, our cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.

*Lukumi*, 508 U.S., at 531. Two sentences later, however, the Court wrote:

> A law failing to satisfy these [neutrality and general applicability] requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest.

*Id*., at 531-32.

In analyzing 31 U.S.C. § 5112(d)(1) and 31 U.S.C. § 5114(b) (in terms of their neutrality under the Free Exercise Clause) "we must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Lukumi*, 508 U.S., at 533. Facially, those statutes are as discriminatory as can be, since "United States coins shall have the inscription 'In G-d We Trust'" and "United States currency has the

inscription 'In G-d We Trust'" unquestionably associate the United States with Monotheistic religious belief. Additionally, they (of necessity) assert on the part of the government of the United States that Atheists are wrong in their religious exercise choices. Moreover – except as maintained by those intent on "us[ing] the machinery of the State to practice [their] beliefs," *Abington School District v. Schempp*, 374 U.S. 203, 226 (1963) – there is no secular meaning to "In G-d We Trust." Since, as stated in *Lukumi*, 508 U.S., at 533, "[a] law lacks facial neutrality if it refers to a religious practice without a secular meaning discernible from the language or context," both laws at the heart of this case lack facial neutrality.

Even were that not the case, "[t]he [Free Exercise] Clause 'forbids subtle departures from neutrality,' and 'covert suppression of particular religious beliefs.'" *Id.*, at 534 (citations omitted). The religious espousal in "In G-d We Trust" is far more than "subtle," and "covert" seems to be a rather mild adjective to describe the suppression of Atheist thought and belief that occurs when the national government places, in essence, "Atheists Are Wrong" on each and every one of the billions of coins and currency bills produced by the Treasury Department.

*Lukumi* went on to say that "the effect of a law in its real operation is strong evidence of its object." Sample letters from children, RE 8-6, Page ID

#371-72, demonstrate that the effect of the challenged statutes is quite vile in their "real operation." Children, above all, should never be sent a message by the government that their (or their family's) religious beliefs are unworthy, inferior or incorrect. That they are constantly sent this message by what are likely the most ubiquitous objects in their lives is "utterly revolting." *See Korematsu v. United States*, 323 U.S. 214, 242 (1944) (Murphy, J., dissenting) ("[D]iscrimination in any form and in any degree ... is unattractive in any setting but it is utterly revolting among a free people who have embraced the principles set forth in the Constitution of the United States."). If this is not immediately obvious to the panel, then its members might wish to consider the inscription of the constitutionally identical "In the Caucasian Race We Trust" on all our money. *See Smith*, 494 U.S., at 886 n.3 ("Just as we subject to the most exacting scrutiny laws that make classifications based on race, ... so too we strictly scrutinize governmental classifications based on religion." (Citation omitted.)). Would our society (or, more importantly, our federal judiciary) ignore the effects which that motto would have on children of Black, Asian, and other non-Caucasian races? Certainly not. In fact, no court would permit that governmental inscription on even a single coin, much less on every one of the billions of coins the government produces. Yet, so far, five federal courts of appeals –

using arguments that put *Korematsu* to shame in terms of prejudice and lack of principle – have not only condoned, but perpetuated and actively supported those effects upon Atheist children.

Utterly revolting, indeed.

## III. Defendants Have Violated Plaintiffs' Rights Under the Free Speech Clause

Blurring issues (and ignoring logic, law, the historical record, and the motto's text), the District Court argued that "[n]o reasonable viewer would think a person handling money does so to spread its religious message."[26] RE 39, Page ID #710. Yet two sentences earlier the Court stated that "a reasonable viewer could think that a driver supported th[e] message placed by the state on a license plate." To be sure, Chief Justice Burger stated "that currency, which is passed from hand to hand, differs in significant respects from an automobile, which is readily associated with its operator." *Wooley v. Maynard*, 430 U.S. 705, 717 n.15 (1977). However, in making that statement, the Chief Justice never stated that the differences suffice (or are even relevant) for leaving the latter act within the First Amendment's purview and casting the former act away.

---

[26] It is worth noting that the District Court acknowledged that "In G-d We Trust" is a "religious message." Thus, Defendant's suggestion that the laws mandating inscriptions of the motto on the money are "neutral laws of general applicability," RE 37, Page ID #667, and that the "In G-d We Trust" phrase is "not religious dogma," *id.*, Page ID #674, ring quite hollow.

In fact, earlier in *Wooley*, the Chief Justice said essentially the same thing in regard to the fact that an automobile "differs in significant respects" from pledging allegiance, writing that "[c]ompelling the affirmative act of a flag salute involved a more serious infringement upon personal liberties than the passive act of carrying the state motto on a license plate." *Id.*, at 715. Yet both were deemed to be covered by the Free Speech Clause. Whether it is an unwilling active pledge or an unwilling "passive act," the First Amendment and its principles still provide protection, and "the difference is essentially one of degree." *Id.*

More importantly, the District Court's argument is a straw man. The issue in this case is not what persons are seeking to accomplish when they spend money, but whether they are being forced to bear a governmental message that they do not wish to bear. "No reasonable viewer would think a person" driving her car does so to spread the message the state puts on her license plate, either. Nonetheless, the Supreme Court held that New Hampshire violated George Maynard's Free Speech rights when it made him bear that message. "[T]he State's interest ... to disseminate an ideology ... cannot outweigh an individual's First Amendment right to avoid becoming the courier for such message." *Wooley*, 430 U.S., at 717.

Additionally, just as it is inappropriate for a judge to decide if an individual's determination of his or her free exercise of religion is reasonable, *see Burwell*, 134 S. Ct., at 2778 ("[The question that the federal courts have no

business addressing [is] whether the religious belief asserted in a RFRA case is reasonable."), it is inappropriate for a judge to decide whether it is reasonable for an individual to believe any particular message is one that he or she is supporting, ignoring, or denying. If Plaintiffs feel they are furthering the sentiment of the "In G-d We Trust" message when they pass coins or currency bills in commerce, it is part of their free speech right to make that determination. *See Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) ("[T]he speaker and the audience, not the government, assess the value of the information presented.") Plaintiffs sincerely believe they are furthering the "In G-d We Trust" message when they use the money. The inquiry should end with that belief.

Even if the District Court were not abusing its power in telling Plaintiffs that the judiciary, and not the individual, gets to decide what does or does not comprise that individual's expressive conduct, it surely is abusing its power to make that odious determination by ignoring the contrary words of those responsible for placing the religious message on the coins. The record shows clearly that what began this entire matter was Treasury Secretary Salmon P. Chase's desire during the Civil War era to have "[t]he trust of our people in G-d ... declared on our national coins." RE 8, Page ID #265 (¶ 121). The Director of the Mint similarly stated that "[o]ur national coinage in its devices and legends should indicate the Christian character of our nation, and declare our trust in G-d." *Id*. (¶ 125).

Many of the other actors who pressed to maintain those words on the coins and currency bills announced such goals as:

(1) Sending the nation's money "across the ocean" in order to "preach the religions of Jesus Christ," RE 8, Page ID #311 (¶ 405);

(2) Declaring "not only to our people at home, but to all peoples, and to all nations, all over the world, that ours is a nation with a firm and steadfast faith in G-d." *Id.* (¶ 406);

(3) "[A]ffirm[ing] our trust in G-d in such a manner that it will be heard around the world." RE 8, Page ID #312 (¶ 407);

(4) Placing "In G-d We Trust" on our currency because "the American dollar travels all over the world, into every country of the world, and frequently gets behind the Iron Curtain, and ... it carries this message." *Id.* (¶ 408);

(5) Having "the principles laid down by G-d ... kept alive in the hearts and minds of our friends enslaved behind the Iron Curtain." *Id.* (¶ 410); and

(6) Having "that inscription … indicat[e] to the world that … the thing upon which we should rely ... is G-d." *Id.* (¶ 411).

Thus, the manifest intent of key actors in the events that led to the motto on the money has been to spread the "In G-d We Trust" message throughout the world. In fact, in 2003, the Mint itself proudly proclaimed in its Official 2003 Annual Report that "[w]herever United States coins travel, they serve as reminders of the values that all Americans share," RE 8, Page ID #312 (¶ 412), and that "[o]ur coins are small declarations of our beliefs ... [that] serve as ambassadors of American values and ideals," *id.*, Page ID #313 (¶ 413).

These claims, however – at least as they pertain to the religious message, "In G-d We Trust" – are false. That message is not shared by "all Americans," and it is a small declaration of a belief, value, and ideal that only some adhere to. Others, such as Plaintiffs here, find that religious value to be erroneous, misguided and demeaning. If, as this Circuit has held, "governments cannot compel citizens to support positions with which they disagree," *Kidwell v. City of Union*, 462 F.3d 620, 624 (6th Cir. 2006), and if, as the Supreme Court has held, "freedom of speech prohibits the government from telling people what they must say," *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 126 S. Ct. 1297, 1308 (2006), then Plaintiffs here have every right, under the Free Speech Clause, to be able to use the nation's sole legal tender without bearing that offensive religious message.

## IV. Defendants Have Violated Plaintiffs' Rights Under the Equal Protection Component of the Due Process Clause

In 1973, Congress passed a Rehabilitation Act (Pub. L. No. 93-112, 87 Stat. 394, codified at 29 U.S.C. § 701, *et seq*). Section 504 of that act guarantees certain rights to people with disabilities. In 2002, after some members of the blind community became weary of having to use currency that had no adequate distinguishing features (to help them determine which of the various

denominations of United States currency bills they were using), they initiated a lawsuit against one of Defendant Treasury Secretary Lew's predecessors.[27] In that case, the D.C. Circuit held that the Treasury violated Section 504 of the Rehabilitation Act by failing to provide meaningful access to United States currency for blind and other visually impaired persons.

The facts in regard to *Paulson*, as compared with the facts in this case, are remarkable. To begin with, Congress, over the past century and a half, has repeatedly chosen to marginalize Atheists (and others) by "witness[ing] our faith in Divine Providence," RE 8, Page ID #287 (¶ 261), via the inscriptions of "In G-d We Trust" on the money. Congress has even "reaffirmed" that exclusionary religious claim, twice over the last fifteen years, RE 9, Page ID #406, doing nothing but further belittling Atheists and their religious choices. This has all occurred despite the Constitutional mandate for religious equality in the First Amendment.

For the blind (and other handicapped individuals), Congress has acted quite differently. Although there is no constitutional command to help the disabled, Congress has passed a Rehabilitation Act that is a testament to American compassion as well as to its dedication to the principles of equal protection.

---

[27] https://www.moneyfactory.gov/maprogrambackground.html.

Never did anyone suggest that the blind be marginalized, perhaps by placing "In Vision We Trust" on our money. Never has the Treasury Department ever maintained on its website that it and the Department of Justice "intend to actively defend against challenges to the continued use of the sighted-user-only currency bills."[28] Rather, it has done such things as commission a 139-page report on options to enable the blind to denominate the currency.[29]

The federal courts have not manufactured embarrassing, shameful and inane excuses for creating and perpetuating a second-class status of the blind. They did not say that being unable to read the denominations on our currency bills "has nothing whatsoever to do with a disability and has no daily living impact." *Cf. Aronow v. United States*, 432 F.2d 242, 243 (9th Cir. 1970) (asserting that inscribing "In G-d We Trust" on the nation's money "has nothing whatsoever to do with the establishment of religion …. [and] has no theological … impact." 432 F.2d at 243. They did not say it is fine to have currency bills that the blind cannot distinguish between because such bills "symbolize the historical role of good vision in our society, formalize our medium of exchange, and fosters patriotism." *Cf. Gaylor v. United States*, 74 F.3d 214 (10th Cir. 1996) ("The motto symbolizes the historical role of religion in our society, formalizes our medium of exchange,

---

[28] "The Department of the Treasury and the Department of Justice intend to actively defend against challenges to the use of the national motto." http://www.bep.gov/resources/faqs.html.
[29] http://www.bep.gov/images/ARINC_Final_Report_7-26-09.pdf.

[and] fosters patriotism." *Id.*, at 216 (citations omitted)). With it being obvious (in terms of the ability to use our currency) that there is no "neutrality" between the sighted and the blind when features denominating the bills are lacking, no appellate panel opted to replace an honest analysis with a few irrelevant quotes set in a footnote, ignoring the Supreme Court's clear edict (in *McCreary County v. ACLU*, 545 U.S. 844, 860 (2005)) that neutrality is to be "the touchstone for our analysis." *Cf.*, *Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014) (stating, e.g., "an appeal to neutrality alone cannot possibly lay every issue to rest," "it is sometimes difficult to determine when a legal rule is neutral," and "untutored devotion to the concept of neutrality can lead to ... even active, hostility to the religious." *Id.*, at 107 n.2 (citations and internal quotation marks omitted)). Never have the blind heard that "governmental acknowledgments of healthy vision serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society." *Cf. Lynch v. Donnelly*, 465 U.S. 668, 693 (1984) (O'Connor, J., concurring) ("Those government acknowledgments of religion [such as 'In G-d We Trust'] serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society.").

Finally, no District Court has told the blind that they are not being subjected to disparate treatment because the currency bills "affect all citizens equally, regardless of their visual acuity." *Cf.* RE 39, Page ID #712 (stating that coins and currency bills that have "In G-d We Trust" on them "affect all citizens equally, regardless of their religious beliefs."). According to the District Court, "a plaintiff must first demonstrate that she is being treated differently from similarly-situated individuals." *Id.*, at Page ID #711. But courts always have the option of ignoring reality and doing as the Supreme Court did, for instance, in *Plessy v. Ferguson*, 163 U.S. 537, 543 (1896) ("A statute which implies merely a legal distinction between the white and colored races ... has no tendency to destroy the legal equality of the two races."). That's what the District Court did here, stating that when the government produces money that supports one group's religious views and denigrates the religious views of another group, it is treating them "the same under the law." RE 39, Page ID #712. It is interesting that the court could see that people were treated disparately based on sexual orientation in *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015). After all, the law applied to everyone equally: Everyone needs to have an opposite-sex partner in order to get married. No?

## CONCLUSION

For the reasons set forth above, the District Court's grant of Defendants' Motion to Dismiss should be reversed. The statutes at issue in this case, 31 U.S.C. §§ 5112(d)(1) and 5114(b) should be invalidated under RFRA. If the Court disagrees in regard to that statute's reach, §§ 5112(d)(1) and 5114(b) should be invalidated under the Free Exercise Clause, the Free Speech Clause, and/or the Fifth Amendment's Due Process Clause.

Respectfully submitted,

/s/ Michael Newdow                     /s/ Thomas M. Horwitz
CA Bar #220444                         Ohio Bar #0062323
PO Box 248                             1991 Crocker Road, Suite 600
Nice, CA  95464                        Westlake, OH  44145


(916) 273-3798                         (440) 892-3331
NewdowLaw@gmail.com                     tmh@horwitzlpa.com


*Attorneys for all plaintiffs.*

## <u>CERTIFICATE OF COMPLIANCE</u>

### TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

**1.** This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i). According to Microsoft Word's Word Count "Statistics," this brief contains 10,959 words, excluding the addenda and the parts of the brief exempted by Fed. R. App. P. 32(f) and 6 Cir. R. 32(b)(1).

**2.** This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word (part of Microsoft Office Home and Student 2010, version 14.0.7177.5000 (32-bit)) in 14-point Times New Roman font.

/s/ Michael Newdow                    Dated: January 10, 2017

Attorney for all Plaintiffs

# DESIGNATION OF LOWER COURT DOCUMENTS

| Record Entry | Description | Page Range | AOB Page(s) Where Cited |
|---|---|---|---|
| 08 | Pl.'s First Am. Compl. | 210-321 | 3, 8, 9, 10, 32, 33, 40, 41 |
| 08-6 | FAC - Child Letters | 368-373 | 36 |
| 09 | Def.'s Motion to Dismiss | 396-420 | 3, 43 |
| 37 | Def.'s Reply Memorandum | 661-679 | 38 |
| 39 | Memorandum & Order | 705-712 | 2, 3, 16, 19, 22, 25, 29, 31, 38, 46 |
| 40 | Judgment Entry | 713 | 2, 3 |
| 41 | Notice of Appeal | 714 | 2 |